**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **ADIRONDACK MEDICAL CENTER, *et al.*,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**KATHLEEN SEBELIUS, Secretary, Department of Health and Human Services,**<br><br>**Defendant.** | ) | **Civil Action No. 11-1671 (RMC)**<br>**(Consolidated with 12-457)** |

**OPINION**

This case arises out of the federal Medicare program; it relates to payments to rural and sole community hospitals for the inpatient care they provide to Medicare beneficiaries. The Secretary of Health and Human Services adjusted the rate paid to these types of hospitals downward in order to ameliorate the increasing rate paid to all hospitals due to revamping the diagnosis coding system. The authority for this adjustment is found in a general statutory provision. Plaintiffs object to the downward adjustment. They contend that because Congress *expressly* authorized the Secretary to make such a downward adjustment for other types of hospitals without similarly providing for such an adjustment for rural and sole community hospitals, Congress stripped the Secretary of authority to make the same type of downward adjustment for rural and community hospitals. The Secretary did not read the legislative silence in this way, and the Court defers to the Secretary's reasonable statutory interpretation. Plaintiffs' complaint will be dismissed for failure to state a claim.

## I. FACTS

Medicare is a federal health insurance program for the elderly and the disabled. 42 U.S.C. § 1395 *et seq*. Under Medicare Part A, the Secretary reimburses participating hospitals for care they provide to Medicare beneficiaries. Plaintiffs are providers of hospital services that have been designated under Medicare as either a "sole community hospital" or a "Medicare-dependent, small rural hospital." *See* 42 U.S.C. § 1395ww(d)(5)(D)(iii) (defining sole community hospital); *id*. § 1395ww(d)(5)(G)(iv) (defining rural hospital). Because they are critical to providing hospital services in remote and rural areas and because they face significant financial difficulties, the Medicare Act provides special payment protections for such hospitals. *Id*. §§ 1395ww(d)(5)(D) & 1395ww(d)(5)(G).

In order to provide a cost-savings incentive, Congress directed the Secretary to create an "inpatient prospective payment system" ("IPPS"), whereby the Secretary pays the hospital a fixed payment for each patient discharge, as described in 42 U.S.C. § 1395ww(d). *Methodist Hosp. of Sacramento v. Shalala*, 38 F.3d 1225, 1226-27 (D.C. Cir. 1994). The rate is set in advance and that is the amount paid no matter how much the hospital actually spends on that patient. *Id*. Because hospitals are paid a fixed rate, they are encouraged to minimize the cost of treatment. *Id*.

IPPS depends on the patient's diagnosis. Diagnoses are assigned to a "diagnosis related group" (DRG), and each DRG is assigned a weight that is multiplied by a base dollar amount to determine payment. 42 C.F.R. § 412.64(g). The majority of hospitals are paid the

"federal rate," the product of the DRG times a base dollar "standardized" amount.[1] *Id*. Sole community and rural hospitals are paid the "hospital-specific rate," the product of the DRG times each hospital's unique target amount. The target amount is based on each hospital's historic per-person operating costs in a specific year. 42 U.S.C. § 1395ww(d)(5)(D); *id*. § 1395ww(d)(5)(G). Sole community and rural hospitals are paid whichever rate yields a higher payment, the federal rate or the hospital-specific rate.[2] *Id*.

Effective at the start of Fiscal Year ("FY") 2008,[3] the Secretary implemented a new diagnosis classification system using "Medicare severity diagnosis-related groups," called MS-DRGs. *See* 72 Fed. Reg. 66,580, 66,886 (Nov. 27, 2007). Just like the original DRG system, the Secretary assigns a weight to each MS-DRG. The value of the MS-DRG is multiplied by the standardized amount to determine the federal rate and by the target amount to determine the hospital-specific rate. The MS-DRG system was designed to better account for differences in the severity of an illness. *Id*.

The Secretary anticipated changes to how hospitals code and report diagnoses under the new system and predicted a resulting increase in payments, *i.e.*, "coding creep." To combat such coding creep, the Secretary adjusted the federal rate downward. *See* 72 Fed. Reg.

---

[1] The standardized amount is roughly an average of operating costs per discharge of all patients for all IPPS hospitals in a given time period. 42 U.S.C. § 1395ww(d)(2)(C).

[2] For rural hospitals, if the hospital-specific rate is higher than the federal rate, the hospital is paid the federal rate plus 75% of the amount by which the hospital-specific rate exceeds the federal rate. 42 U.S.C. § 1395ww(d)(5)(G)(ii)(II).

[3] Fiscal year 2008 started on October 1, 2007.

47,130 (Aug. 22, 2007) ("August 2007 Final Rule").[4] Specifically, actuaries estimated that an adjustment of -4.8% over the course of three years was needed to maintain budget neutrality, and the Secretary established a -1.2 % prospective adjustment for FY 2008 and -1.8% for FY 2009. *Id*. at 47,416.

As authority for the rate adjustment, the Secretary cited 42 U.S.C. § 1395ww(d)(3)(A)(vi), enacted in 2000, which provides for adjustments to the federal rate:

> Insofar as the Secretary determines that the adjustments under paragraph (4)(C)(i) [providing for annual adjustments to the DRGs and weighting factors] for a previous fiscal year (or estimates that such adjustments for a future fiscal year) did (or are likely to) result in a change in aggregate payments under this subsection during the fiscal year that are a result of changes in the coding or classification of discharges that do not reflect real changes in the case mix, the Secretary may adjust the average standardized amounts computed under this paragraph for subsequent fiscal years so as to eliminate the effect of such coding or classification changes.

The Secretary originally sought to adjust both the federal rate and the hospital-specific rate in the August 2007 Final Rule. *See generally* 72 Fed. Reg. 47,130.

On September 29, 2007, just two months after the Secretary issued the August 2007 Final Rule adjusting the federal rate downward, Congress enacted the Transitional Medical Assistance, Abstinence Education, and QI Programs Extension Act of 2007. *See* Pub. L. No. 110-90, § 7, 121 Stat. 984 (2007) (attached to Pls.' Reply [Dkt. 21] as Ex. C) ("TMA"). Section

---

[4] Plaintiffs suggest that the term "coding creep" is pejorative. *See* Pls.' Reply [Dkt. 21] at n.4. The Court does not view it that way, as the term only means that under the MS-DRG codes, payments crept up for reasons not related to real changes in patient severity of illness. The Secretary is merely adjusting the payment rate to counterbalance the phenomenon. As the agency indicated in the August 2007 Final Rule, "We do not believe there is anything inappropriate, unethical or otherwise wrong with hospitals taking full advantage of coding opportunities to maximize Medicare payment that is supported by documentation in the medical record." 72 Fed. Reg. at 47,180.

7(a) of the TMA reduced the adjustment of the federal rate specified in the August 2007 Final Rule, providing for a -0.6% adjustment for FY 2008 and a -0.9% adjustment for FY 2009. Section 7(b) further instructed the Secretary how and when to apply an adjustment to the federal rate in the future. If the Secretary determines that implementation of the MS-DRG system results in an increase that does not reflect real changes in patient severity of illness, then the Secretary shall adjust the federal rate downward.[5] TMA § 7(b). Notably, and critically to Plaintiffs'

[5] Section 7(b) provides:

> (b) Subsequent Adjustments
>
> (1) In General. --- Notwithstanding any other provision of law, if the Secretary determines that implementation of [the MS-DRG] system resulted in changes in coding and classification that did not reflect real changes in case mix under [42 U.S.C. § 1395ww(d)] for discharges occurring during fiscal year 2008 or 2009 that are different than the prospective documentation and coding adjustments applied under § (a), the Secretary shall---
>
> > (A) make an appropriate adjustment under paragraph (3)(A)(vi) of [§ 1395ww(d)]; and
> >
> > (B) make an additional adjustment to the standardized amounts under [42 U.S.C. § 1395ww(d)] for discharges occurring only during fiscal years 2010, 2011, and 2012 to offset the estimated amount of the increase or decrease in aggregate payments (including interest as determined by the Secretary) determined, based upon a retrospective evaluation of claims data submitted under such [MS-DRG] system, by the Secretary with respect to discharges occurring during fiscal years 2008 and 2009.
>
> (2) Requirement --- Any adjustment under paragraph (1)(B) shall reflect the difference between the amount the Secretary estimates that implementation of such [MS-DRG] system resulted in changes in coding and classification that did not reflect real changes in case mix and the prospective documentation and coding adjustments applied under subsection (a). An adjustment made under paragraph (1)(B) for discharges occurring in a year shall not be included in the determination of standardized amounts for discharges occurring in a subsequent year.

complaint, the TMA dealt only with the federal rate and was silent as to payments to rural and sole community hospitals.

Two months after the enactment of the TMA, the Secretary determined that her authority to make an adjustment to the federal rate under § (d)(3)(A)(vi) did not apply to the hospital-specific rate. 72 Fed. Reg. at 66,886. She also changed the adjustments to the federal rate as directed by the TMA. *Id.* As a result, sole community and rural hospitals (like Plaintiffs) generally obtained higher payments in FY 2008 and FY 2009.

However, the Secretary still viewed payments to sole community and rural hospitals as artificially inflated by the new MS-DRG. Even though the Secretary did not have the authority to adjust the hospital-specific rate under § (d)(3)(A)(vi), she determined in 2011 that she had authority under a "special exceptions and adjustments" provision. This "gap-filler" provision authorizes the Secretary to provide "for such other exceptions and adjustments to [IPPS] payment amounts . . . as the Secretary deems appropriate." 42 U.S.C. § 1395ww(d)(5)(I)(i).[6] The Secretary engaged in notice and comment rulemaking and promulgated a Final Rule reducing the hospital-specific rate for FY 2011 and FY 2012. Finding that the predicted coding creep had occurred in FY 2008 and FY 2009, *i.e.*, that there was an artificial increase in payments unrelated to any actual change in the severity of illnesses treated, the Secretary made a -2.9 % adjustment to both the federal rate and to the hospital-specific rate for FY 2011. 75 Fed. Reg. 50,042, 50,067-71 (Aug. 16, 2010). Similarly, the Secretary made a -2.0% downward adjustment for FY

*Id*. The FY 2008 and FY 2009 adjustments were finalized through rulemaking. *See* 72 Fed. Reg. at 66,886 (adjustment for FY 2008); 73 Fed. Reg. 48,447, 48,434 (Aug. 19, 2008) (adjustment for FY 2009).

[6] Subsection 1395ww(d)(5)(I)(i) was in place for some years before 2000 when § (d)(3)(A)(vi) was enacted.

2012 in both the federal as well as the hospital-specific rates.  76 Fed. Reg. 51,476, 51,499 (Aug. 18, 2011).[7]

Plaintiffs filed a request for expedited judicial review with the Provider Reimbursement Review Board ("PRRB").  The PRRB determined that it lacked jurisdiction, or alternatively, that expedited judicial review was appropriate.  Plaintiffs appealed and the Administrator for the Centers for Medicare & Medicaid Services reversed the finding of no jurisdiction, thereby removing any barrier to immediate judicial review.

Plaintiffs immediately filed suit, asserting that the reduction of the FY 2011 hospital-specific rate should be set aside because it was outside the Secretary's statutory authority and because it was arbitrary and capricious.  They filed a second complaint challenging the FY 2012 downward adjustment to the hospital-specific rate for the same reasons.  The cases were consolidated here.

The Secretary moves to dismiss for failure to state a claim, arguing that the Secretary had proper authority to adjust the hospital-specific rate downward under the gap-filler provision and that the decision to make such an adjustment was reasonable.  Plaintiffs oppose and move for summary judgment.  They contend, in essence, that the Secretary's express authority to adjust the federal rate under § 1395ww(d)(3)(A)(vi) and the TMA must mean that the Secretary does *not* have similar authority to adjust the hospital-specific rate.

---

[7]  The Secretary proposes for FY 2013 a -1.9 % reduction in the federal rate and a -0.5% reduction in the hospital-specific rate.  *See* 77 Fed. Reg. 27,870, 27,886, 27,889 (May 11, 2012).

## II.  LEGAL STANDARD

### A.  Dismissal for Failure to State a Claim

A motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) challenges the adequacy of a complaint on its face.  Fed. R. Civ. P. 12(b)(6).  A complaint must be sufficient "to give a defendant fair notice of what the . . . claim is and the grounds upon which it rests."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted).  Although a complaint does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Id.*  To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is "plausible on its face."  *Twombly*, 550 U.S. at 570.

A court must treat the complaint's factual allegations as true, "even if doubtful in fact."  *Id.* at 555.  But a court need not accept as true legal conclusions set forth in a complaint.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  In deciding a motion under Rule 12(b)(6), a court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits or incorporated by reference, and matters about which the court may take judicial notice.  *Abhe & Svoboda, Inc. v. Chao*, 508 F.3d 1052, 1059 (D.C. Cir. 2007).

### B.  APA Review

#### 1.  Authority

Plaintiffs contend that the Secretary's action must be set aside as "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(C).  "An agency's power is not greater

than that delegated to it by Congress." *Lyng v. Payne*, 476 U.S. 926, 937 (1986); *see also Transohio Sav. Bank v. Dir., Office of Thrift Supervision*, 967 F.2d 598, 621 (D.C. Cir. 1992). Agency actions beyond delegated authority are *ultra vires* and should be invalidated. *Transohio*, 967 F.2d at 621. A court looks to the agency's enabling statute and subsequent legislation to determine whether the agency has acted within the bounds of its authority. *Univ. of D.C. Faculty Ass'n/NEA v. D.C. Fin. Responsibility & Mgmt. Assistance Auth.*, 163 F.3d 616, 620-21 (D.C. Cir. 1998).

When reviewing an agency's interpretation of its enabling statute, a court undertakes a two-step analysis as set forth in *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc*., 467 U.S. 837 (1984). *See Mount Royal Joint Venture v. Kempthorne*, 477 F.3d 745, 754 (D.C. Cir. 2007). First, the court determines whether "Congress has directly spoken to the precise question at issue" and, if so, the court must "give effect to the unambiguously expressed intent of Congress." 467 U.S. at 842-43. To decide whether Congress has addressed the precise question at issue, the court analyzes the text, purpose, and structure of the statute. *Ranbaxy Labs. Ltd. v. Leavitt*, 469 F.3d 120, 124 (D.C. Cir. 2006). When the statute is not ambiguous, the text controls and no deference is extended to an agency's interpretation in conflict with the text. *Chase Bank U.S.A., N.A. v. McCoy*, 131 S. Ct. 871, 882 (2011).

If, on the other hand, the statute is ambiguous or silent on an issue, the court proceeds to the second step of the *Chevron* analysis and determines whether the agency's interpretation is based on a permissible construction of the statute. *Chevron*, 467 U.S. at 843; *Sherley v. Sebelius*, 644 F.3d 388, 393 (D.C. Cir. 2011). Under the second *Chevron* step, a court determines the level of deference due to the agency's interpretation of the law it administers. *See*

*Kempthorne*, 477 F.3d at 754. When the agency's interpretation is permissible and reasonable,[8] it receives controlling weight. *Id.* at 754. Applying *Chevron* deference, a court defers to the agency, "even if the agency's reading differs from what the court believes is the best statutory interpretation." *See Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs*., 545 U.S. 967, 980 (2005). Under *Chevron* step 2, a plaintiff must show that the statutory language "cannot bear the interpretation adopted by the Secretary." *Sullivan v. Everhart*, 494 U.S. 83, 91-92 (1990). And here, "the tremendous complexity of the Medicare program enhances the deference due the Secretary's decision." *Cmty. Care Found. v. Thompson*, 318 F.3d 219, 225 (D.C. Cir. 2003) (internal quotation marks omitted).

*Chevron* deference is only appropriate if Congress has delegated authority to an agency to make rules having the "force of law" and the agency rule at issue was "promulgated in the exercise of that authority." *United States v. Mead Corp.*, 533 U.S. 218, 230–31 (2001). Generally, if an agency promulgates its interpretation through notice-and-comment rulemaking or formal adjudication, a court gives the agency's interpretation *Chevron* deference. *Id*. The parties agree that this case must be analyzed under the two-step process set forth by *Chevron*.

**2. Arbitrary and Capricious**

In addition to asserting that the Secretary's action was *ultra vires* in violation of 5 U.S.C. § 706(2)(C) of the Administrative Procedure Act ("APA"), Plaintiffs also assert that the Court should set aside the Secretary's downward adjustment of the hospital-specific rate because the action was arbitrary, capricious, and not in accordance with the law in violation of APA

[8] An interpretation is permissible and reasonable if it is not arbitrary, capricious, or manifestly contrary to the statute. *Kempthorne*, 477 F.3d at 754.

§ 706(2)(A). *See Tourus Records, Inc. v. DEA*, 259 F.3d 731, 736 (D.C. Cir. 2001). In determining whether an action was arbitrary and capricious, a reviewing court "must consider whether the [agency's] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 378 (1989) (internal quotation marks omitted). At a minimum, the agency must have considered relevant data and articulated an explanation establishing a "rational connection between the facts found and the choice made." *Bowen v. Am. Hosp. Ass'n*, 476 U.S. 610, 626 (1986) (internal quotation marks omitted); *see also Pub. Citizen, Inc. v. FAA*, 988 F.2d 186, 197 (D.C. Cir. 1993) ("The requirement that agency action not be arbitrary or capricious includes a requirement that the agency adequately explain its result."). An agency action usually is arbitrary or capricious if

> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

As the Supreme Court has explained, "the scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. Rather, agency action is normally "entitled to a presumption of regularity." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977).

## III. ANALYSIS

Plaintiffs' challenge to the Secretary's authority and to the reasonableness of the

Secretary's decision is governed by *Chevron*. Under step one of *Chevron*, the Court must determine whether "Congress has directly spoken to the precise question at issue" and if so, the Court must "give effect to the unambiguously expressed intent of Congress." *Kempthorne*, 467 U.S. at 842-43.

Subsection (d)(3)(A)(vi) and the TMA unambiguously address only adjustments to the federal rate. Further, § (d)(5)(I)(i) plainly grants broad authority to the Secretary to provide "for such other exceptions and adjustments to [IPPS] payment amounts . . . as the Secretary deems appropriate." 42 U.S.C. § 1395ww(d)(5)(I)(i). The ambiguity lies in what § (d)(3)(A)(vi) and TMA do not say. They do not address adjustments to the hospital-specific rate. Plaintiffs claim that the statutes' silence on the topic of the hospital-specific rate works to revoke the Secretary's authority under § (d)(5)(I)(i) to make such adjustments. They argue that "[i]n drafting the TMA and § 1395ww(d)(3)(A)(vi) to specify adjustments to the standardized amount, Congress intended to exclude adjustments to the hospital-specific rate." Pls.' Opp'n [Dkt. 10] at 18.[9]

Since § (d)(3)(A)(vi) and the TMA are silent on the issue of adjustments to the hospital-specific rate, the Court proceeds to the second step of the *Chevron* analysis to determine whether the Secretary's interpretation is based on a permissible construction of the statute. *Chevron*, 467 U.S. at 843. Because the Court finds that the Secretary's construction is

[9] The Secretary asserts that Plaintiffs waived their arguments based on the TMA because they did not specifically cite it during the notice and comment period. However, the Secretary herself raised the issue of the TMA in her opening brief. *See* Def.'s Mot. to Dismiss [Dkt. 7] at 12 n.2. Further, Plaintiffs cited the TMA during their administrative appeal to the Provider Reimbursement Review Board and in the Complaint filed in Civil No. 12-457. When Civil No. 12-457 was consolidated with this case, the Secretary was required to address the issues raised in that case in her Reply brief, *see* Minute Order Apr. 13, 2012, and she did so. Plaintiffs' claim concerning the TMA has been properly raised and fully briefed.

permissible and reasonable, her construction must be given controlling weight. Her decision to adjust the hospital-specific rate for FY 2011 and FY 2012 was not arbitrary or capricious.

Plaintiffs insist that when Congress granted the Secretary authority to adjust the federal rate under § (d)(3)(A)(vi), Congress must have repealed the Secretary's general adjustment authority under § (d)(5)(I)(i). But § (d)(3)(A)(vi) merely states that to the extent the Secretary finds the new MS-DRG coding system caused (or likely will cause) an artificial rate increase unrelated to the severity of patient illness, the Secretary "may adjust the average standardized amounts[10] computed under [§1395ww(d)(3)] . . . to eliminate" that effect. TMA contains a similar provision. *See* TMA § 7(b) (providing that if the Secretary determines that the new coding system has resulted in artificially high payments, the Secretary shall make an appropriate adjustments to the federal rate). Subsection (d)(3)(A)(vi) and the TMA do not contain prohibitory language stating that the Secretary is barred from adjusting the hospital-specific rate, nor do they contain limiting language, such as "the Secretary may adjust *only* the federal rate" or "an adjustment to the federal rate is the *only* way the Secretary may address the problem of artificially inflated requests for payment."[11] *See Pub. Citizen, Inc. v. Rubber Mfrs. Ass'n*, 533 F.3d 810, 817 (D.C. Cir. 2008) ("Congress knows well how to say that [action is authorized] *only* under specified provisions or circumstances, but it did not do so here.")

Furthermore, Plaintiffs' claim that the Secretary's § (d)(5)(I)(i) catchall authority was implicitly repealed by later statutory enactments asserts a repeal by implication. Repeals by

---

[10] The "standardized" amount is the starting point for calculating the federal rate.

[11] The placement of § (d)(3)(A)(vi) also reflects Congress' intent to address only the adjustment to the federal rate. Section (d)(3)(A) is headed "Updating previous standardized amounts," and § d)(3)(A)(vi) is one of six subsections that address only the standardized rate.

implication are disfavored and "will not be presumed unless the intention of the legislature to repeal [is] clear and manifest." *Hawaii v. Office of Hawaiian Affairs*, 129 S. Ct. 1436, 1445 (2009). There is no such clear and manifest indication that Congress intended to repeal the catchall adjustment provision by enactment of either § (d)(3)(A)(vi) or the TMA.

The D.C. Circuit rejected a claim similar to Plaintiffs' claim in *Amgen, Inc. v. Smith*, 357 F.3d 103, 106 (D.C. Cir. 2004). There, the plaintiff challenged a different catchall provision in the Medicare Act, 42 U.S.C. § 1395*l*(t)(2)(E), which empowers the Secretary to make "other adjustments as determined to be necessary to ensure equitable payments." The *Amgen* plaintiff claimed that parts of the Medicare Act that set forth particular steps to making and calculating payment adjustments operated to limit the Secretary's authority to make other adjustments under § 1395*l*(t)(2)(E). *Amgen*, 357 F.2d at 106. The Circuit found the claim lacked merit, emphasizing that the Secretary should not be stripped of catchall authority when Congress relies on the Secretary's expertise in managing the complexities of the Medicare program. *Id.* at 106, 117.

Plaintiffs' assertion of "repeal by implication" is closely related to their misguided assertion that their statutory interpretation is mandated because "the specific governs the general." To resolve a contradiction within a statute, courts often find that a specific provision that *conflicts with* a general provision controls. *See Edmond v. United States*, 520 U.S. 651, 657 (1997); *Varity Corp. v. Howe*, 516 U.S. 489, 512 (1996). The "specific governs the general" maxim "is not an absolute rule, but merely a strong indication of statutory meaning that can be overcome by textual indications that point in the other direction." *RadLAX Gateway Hotel, LLC v. Amalgamated*

*Bank*, 132 S. Ct. 2065, 2072 (2012).[12]   Here, there simply is no conflict.   Subsection (d)(3)(A)(vi) and the TMA authorize the Secretary to make an adjustment to the federal rate and § (d)(5)(I)(i) also permits the Secretary to make adjustments.

Plaintiffs also assert that to construe § (d)(5)(I)(i) as a broad grant of authority renders the more limited grant in § (d)(3)(A)(vi) and the TMA mere surplusage.   *See Radlax*, 132 S. Ct. at 2071 (the specific/general canon applies to avoid contradiction as well as to avoid superfluity).   The canon of construction regarding superfluities, like the concept that "the specific governs the general," is not a mandate.   The canon merely provides that "if possible" a court should construe a statute to give effect to every word and clause and should avoid a construction that renders a word or clause surplusage.   *Rubber Mfrs*, 533 F.3d at 816-17.   The subsections at issue here, as construed by the Secretary, are not redundant.[13]   Subsection (d)(5)(I)(i) permits the Secretary to make any adjustment deemed appropriate, while § (d)(3)(A)(vi) and the TMA empower the Secretary to adjust the federal rate under the circumstances specified.

---

[12]  Despite Plaintiffs' claim to the contrary, *RadLAX* is not particularly helpful in deciding this case.   In *RadLAX*, the Supreme Court rejected a debtor's claim that its bankruptcy plan should be permitted as a cramdown because it provided creditors the "indubitable equivalent" of their claims under 11 U.S.C. § (b)(2)(A)(iii).   Critically, the proposed plan included the sale of collateral at auction without the "credit bid" procedure required by the immediately prior subsection, § (b)(2)(A)(ii), which was enacted at the same time.   *RadLAX*, 132 S. Ct. at 2069.   The Court reviewed *de novo* the meaning of these two provisions and found that the terms of the specific provision (requiring the credit bid procedure) must be honored.   *Id*. at 2071-72.   Here, the Court must give *Chevron* deference to the Secretary's construction of § (d)(5)(I)(i), enacted years before § (d)(3)(A)(vi).   Further, the Secretary's application of § (d)(5)(I)(i) to the hospital-specific rate does not impact the adjustment to the federal rate in § (d)(3)(A)(vi) or the TMA.

[13]  Even if these clauses were deemed to be redundant, the result is not that § (d)(3)(A)(vi) and the TMA repeal § (d)(5)(I)(i).   "Redundancies across statutes are not unusual events in drafting, and so long as there is no 'positive repugnancy' between two laws, a court must give effect to both."   *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253 (1992) (citation omitted).   There is no conflict, let alone "repugnancy," between the clauses at issue.

Plaintiffs also argue that the Court should make a negative inference due to the congressional silence regarding the hospital-specific rate in § (d)(3)(A)(vi) and the TMA, on the bases of the old maxim, the "expression of one thing implies the exclusion of another." In other words, Plaintiffs contend that by empowering the Secretary to adjust the federal rate, Congress stripped the Secretary of power to adjust the hospital-specific rate. The Circuit applied this concept in *Halverson v. Slater*, 129 F.3d 180 (D.C. Cir. 1997), where it held that 49 U.S.C. § 2104, the statute authorizing the Secretary of Transportation to delegate powers over Great Lakes pilotage to Coast Guard officials, was intended to exclude delegations of authority to non-Coast Guard officials under a catchall delegation provision, 49 U.S.C. § 322. The Circuit determined that a delegation of power to the Coast Guard meant that power could not be delegated to a non-Coast Guard entity.

Even so, *Halverson* did not set forth a hard and fast rule. To determine whether the mention of one thing *actually* implies the exclusion of another, a court examines the text, structure, legislative history, and purpose of the statute. *Shook v. Dist. of Columbia Fin. Responsibility & Mgmt. Assistance Corp.*, 132 F.3d 775, 782 (D.C. Cir. 1998). The *Shook* court explained:

> Sometimes Congress drafts statutory provisions that appear preclusive of other unmentioned possibilities --- just as it sometimes drafts provisions that appear duplicative of others --- simply, in Macbeth's words, "to make assurance double sure." That is, Congress means to clarify what might be doubtful --- that the mentioned item is covered --- without meaning to exclude the unmentioned ones.

*Id*. *Halverson* was decided based on a completely different statute, with a distinct structure, history, and purpose. Here, as discussed above, Congress expressly addressed adjusting the

federal rate to combat coding creep by enacting both § (d)(3)(A)(vi) and the TMA without any reference to the pre-existing catchall adjustment provision. In so doing, Congress lessened the Secretary's announced federal rate adjustment and specified how she should make future adjustments. Its specificity may have been to "make assurance double sure" on rate adjustments for most hospitals. The legislature's silence regarding adjustment to the hospital-specific rate probably speaks more to who lobbied for the lower federal rate adjustments specified in the TMA than to any congressional intent expressed by such silence. There is nothing to support Plaintiffs' assertion that the grant of specific authority to adjust the federal rate repudiated the Secretary's authority to adjust the hospital-specific rate under her existing authority.

Plaintiffs make two additional arguments regarding the TMA. First, they point out that the introductory clause to § 7(b) indicates that the section applies "notwithstanding any other provision of law," reasoning that this language causes the TMA to supplant § (d)(5)(I)(i). This argument fails. The "notwithstanding" clause merely indicates that to the extent that other provisions conflict with § 7(b), § 7(b) controls. Section 7(b) does not conflict with the catchall provision, § (d)(5)(I)(i). As there is no conflict, the "notwithstanding" clause has no bearing on this case.

Second, Plaintiffs argue that § 7(b)(2) directs the Secretary to evaluate federal rate payment data from FY 2008 and 2009 and, if adjustments to the federal rate were too high or too low for that year, to make adjustments in FY 2010, 2011, or 2012 to offset the difference. Plaintiffs allege that the adjustment challenged here was based on the same study and thus no adjustment should have been made to the hospital-specific rate. This argument is based on a mistake of fact. The Secretary conducted a *separate* study of hospital-specific rate payments for

FY 2008 and FY 2009. *See* 75 Fed. Reg. at 50059-63. The adjustment challenged in this case was based on this separate study.

It must be pointed out that sole community and rural hospitals already were entitled by statute to special payment provisions. If Congress wanted to give sole community and rural hospitals the benefit of coding creep, it would do so explicitly. But there is no logical reason why Congress would want to do this in the first place. Plaintiffs' interpretation of the statute flies in the face of the expressed intent of Congress. Subsection (d)(3)(A)(vi) and the TMA manifest the intent to permit the Secretary to make payment adjustments to counteract the artificial inflation of payments under the new coding system. It is illogical to presume that at the same time that Congress empowered the Secretary to reduce the federal rate, it worked against its own purpose by impliedly revoking the Secretary's power to reduce the hospital-specific rate. When Congress has intended to pay sole community and rural hospitals a more favorable rate, it has done so directly and in a way sure to benefit these hospitals, via the special payment provisions. *See* 42 U.S.C. § 1395ww(d)(5)(D) (sole community hospitals); *id*. § 1395ww(d)(5)(G) (rural hospitals). It defies logic to construe § (d)(3)(A)(vi) and the TMA as intended to capture coding creep to benefit sole community and rural hospitals at the expense of federal rate hospitals. The Court cannot find, in the face of the statutes' silence on the precise issue, that the legislature intended to strip the Secretary of the power to adjust the hospital-specific rate under the gap-filler provision.

In sum, the Secretary's interpretation of § (d)(3)(A)(vi) and § 7 of the TMA is entitled to *Chevron* deference. *See Chevron*, 467 U.S. at 843. Since § (d)(3)(A)(vi) and § 7 of the TMA are silent on the issue of adjustment to the hospital-specific rate, the Secretary's determination that she has the authority to adjust the hospital-specific rate under § (d)(5)(I)(i)

is reasonable and permissible. The Secretary's decision to adjust the hospital-specific rate for FY 2011 and FY 2012 was not arbitrary or capricious.

## IV. CONCLUSION

For the reasons stated above, the Secretary's motion to dismiss [Dkt. 7] will be granted, and Plaintiffs' motion for summary judgment [Dkt. 10] will be denied as moot. Further, the Secretary's motion to file a surreply [Dkt. 22] will be granted. This case will be dismissed.

Date: September 17, 2012

/s/
ROSEMARY M. COLLYER
United States District Judge